## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**MICHAEL COPON and**
**MICHAEL COPON STUDIOS,**
**LLC,**

    **Plaintiffs,**

**v.**           **Case No: 6:23-cv-1987-PGB-DCI**

**FRANCIS LARA HO, 1521**
**MOVIE, LLC, INSPIRE**
**STUDIOS, INC. and 7M**
**PICTURES, LLC,**

    **Defendants.**
_____/

### <u>ORDER</u>

   This cause comes before the Court upon Defendants Francis Lara Ho; 1521 Movie, LLC; Inspire Studios, Inc.; and 7M Pictures, LLC's (collectively, "**Defendants**") Motion to Dismiss Second Amended Complaint and to Strike Plaintiffs' Demand for Attorney's Fees (Doc. 67 (the "**Motion**")). Plaintiffs Michael Copon and Michael Copon Studios, LLC (collectively, "**Plaintiffs**") have responded in opposition. (Doc. 91 (the "**Response**")). Upon consideration, the Motion is due to be granted in part and denied in part.

## I.    BACKGROUND[1]

This action concerns expansive allegations brought by Plaintiffs asserting Defendants committed various improprieties during the development, production, post-production, promotion, and release of a feature film entitled 1521 ("**the Film**"). (*See generally* Doc. 58). Plaintiff Michael Copon ("**Copon**") is a producer, actor, writer, and director of Filipino heritage. (*Id.* ¶¶ 28–29). Copon is also the founder of Plaintiff Michael Copon Studios, LLC ("**Copon Studios**"), a production company. (*Id.* ¶¶ 41–42). Copon met Defendant Francis Lara Ho ("**Ho**" or "**Defendant Ho**"), a nurse of Filipino heritage, at a conference in December 2021. (*Id.* ¶¶ 44, 62–63). Ho was in the audience during Copon's presentation, wherein Copon described his desire to make a film about Lapu Lapu, a Filipino war hero. (*Id.* ¶¶ 63–64). Ho later approached Copon and told Copon he wanted to help him produce, direct, and act in films related to Filipino history and culture. (*Id.* ¶¶ 70–71). Ho had never written or produced any movie or series. (*Id.* ¶ 45).

Ho and Copon later orally agreed to work together to produce the Film, which tells the story of Lapu Lapu. (*See id.* ¶¶ 73–75). Ho and Copon never agreed that Copon would provide producing services as an employee or as a work for hire. (*Id.* ¶¶ 78–80). Instead, Ho and Copon agreed that they would be partners in producing the Film. (*Id.* ¶ 76). From January 2022 to September 2022, Copon engaged in producing activities for the Film. (*Id.* ¶¶ 77, 81).

---

[1]    This account of the facts comes from Plaintiffs' Second Amended Complaint. (Doc. 58 (the "**SAC**")). The Court accepts well-pled factual allegations as true when considering motions to dismiss. *Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

Copon initially offered to write the script for the Film. (*Id.* ¶ 84). Ho later told Copon he had found a writer ("**Oishi**") who could write a treatment and draft script for the Film consistent with Copon and Ho's shared vision. (*Id.* ¶¶ 85–87). Copon agreed to allow Oishi to write a treatment for the Film. (*Id.* ¶ 86). However, without Copon's knowledge, Defendant Inspire Studios, Inc. ("**Inspire**"), a company controlled by Ho,[2] entered into a written deal memo with Oishi's company securing her writing services (the "**Oishi Deal Memo**"). (*Id.* ¶¶ 88–90). The Oishi Deal Memo stated that Oishi would serve as a work for hire, would write a draft script for the Film, and that Ho would be her co-writer. (*Id.* ¶¶ 89–90).

After Oishi completed her first treatment for the Film, Copon provided extensive notes and revisions thereto. (*Id.* ¶¶ 92–94). This resulted in a subsequent revised treatment. (*See id.* ¶ 94). Copon provided additional, extensive notes and revisions to the revised treatment. (*Id.* ¶ 95). Subsequently, Oishi produced the first draft script for the Film, which incorporated Copon's notes and revisions. (*Id.* ¶ 96). This concluded Oishi's work on the Film. (*Id.* ¶ 97). Copon continued to revise the script, resulting in a second and third draft script for the Film. (*Id.* ¶¶ 98–99). The third draft script (the "**Shooting Script**") was later used during principal photography and production of the Film. (*Id.* ¶ 101).

---

[2]   Plaintiffs aver that Ho is the chief executive—and the only executive—of each of the Defendant business entities: Inspire; 1521 Movie, LLC; and 7M Pictures, LLC (collectively, the "**Business Entity Defendants**"). (Doc. 58, ¶ 55). Plaintiffs further assert that the Business Entity Defendants are "mere instrumentalities" of Ho, which Ho operates as "interchangeable alter egos." (*Id.* ¶¶ 48–49).

Copon was cast as Lapu Lapu, the starring role in the Film. (*See id.* ¶ 172). In April 2022, Ho asked Copon to help him trim the budget for the Film. (*Id.* ¶¶ 135, 140). Ho and Copon agreed that Copon Studios would provide camera and lighting equipment (the "**Equipment**") for the Film. (*Id.* ¶¶ 141–42). In exchange, Ho would ensure Copon's equity and partnership in the Film by making Copon a member of Defendant 1521 Movie, LLC ("**1521 LLC**") and/or Defendant 7M Pictures, LLC ("**7M LLC**"). (*See id.*). Ho and Copon also agreed that Copon's equity and partnership in the Film would be Copon's compensation for his producing services. (*See id.* ¶ 128). However, unbeknownst to Copon, Ho had already formed 1521 LLC and 7M LLC and had designated himself as the sole authorized representative as to each LLC. (*Id.* ¶ 143).

In June 2022, Ho sent Copon a Memorandum of Agreement regarding Copon's directing services for the Film, which Copon ultimately signed. (*Id.* ¶ 145; *see* Doc. 58-3 (the "**Agreement for Directing Services**")). Therein, Copon agreed to provide directing services for the Film as a work-for-hire for $80,000.00. (*See* Doc. 58, ¶¶ 146–47). Ho and Copon orally agreed that Copon would be paid his average rate for acting in the Film. (*See id.* ¶¶ 171–72). However, Ho and Copon never executed a written agreement for Copon's acting services. (*Id.* ¶ 174).

In late June 2022, Copon brought the Equipment from the United States to the Philippines for production of the Film. (*Id.* ¶ 159). Soon after, Ho informed Copon that Ho had formed 1521 LLC and 7M LLC and did not intend to make Copon a member of either entity. (*Id.* ¶ 160). As a result, Copon insisted that Ho

compensate Copon Studios for providing the Equipment for the Film and Ho agreed to do so. (*Id.* ¶¶ 162–63).

Principal photography for the film took place during August 2022. (*Id.* ¶¶ 102, 165). During this period, Copon provided acting, directing, and producing services for the Film, which was produced using Copon Studios' Equipment and was uploaded onto Copon Studios' hard drives (the "**Drives**"). (*Id.* ¶¶ 180–86; *see id.* ¶ 81). However, Copon Studios has never been paid for its provision of Equipment or Drives for the Film. (*Id.* ¶¶ 169, 211). Further, Copon has never been paid for his acting or producing services and has not been fully paid for his directing services. (*See id.* ¶¶ 128, 143, 177, 212).

Moreover, when the Film was later screened for public audiences, Plaintiffs were not properly credited. (*Id.* ¶¶ 215–25). Instead, Oishi and Ho were credited as the sole co-authors of the Film, a third party was credited as the Film's director, Ho was credited as its producer, and 1521 LLC and Inspire were credited as the production companies for the Film (collectively, the "**False Credits**"). (*Id.*). The False Credits also appeared in advertisements for the Film. (*Id.* ¶ 224).

Finally, Ho secretly registered two copyrights for draft scripts of the Film without listing Copon as a co-author or co-claimant. (*Id.* ¶¶ 114–17). First, in March 2022, Ho registered a copyright as to a draft script for the Film in Ho's own name. (*Id.* ¶¶ 114–15). Then, in July 2022, Ho registered a copyright as to the Shooting Script in the name of 1521 LLC ("**Defendants' Shooting Script Certificate**"). (*Id.* ¶¶ 116–17).

In December 2023, Copon registered his own copyright in the Shooting Script listing himself and Ho as co-claimants ("**Plaintiffs' Shooting Script Certificate**"). (*Id.* ¶ 250; *see* Doc. 58-4). Copon later registered an additional copyright as the sole author and sole claimant for his treatment and script notes for the Film ("**Plaintiffs' Supplemental Certificate**").[3] (Docs. 103-3, 103-4).

In the SAC, Plaintiffs bring twenty-one counts against Defendants, including for declaratory judgments (Counts I, IV); direct and secondary copyright infringement (Counts III, VI–VIII); an accounting (Counts II, V); breaches of oral and written contracts (IX, XII–XIII); violations of the Lanham Act (Count X–XI); unjust enrichment (Count XIV); quantum meruit (Count XV–XVI); fraudulent misrepresentations (Counts XVII–XVIII); violation of the right of publicity (Count XIX); common law misappropriation of likeness (Count XX); and violations of the Florida Unfair and Deceptive Trade Practices Act ("**FUDTPA**") (Count XXI). (*Id.* ¶¶ 253–674). Now, Defendants seek dismissal of all but three counts[4] for failure to state a claim and lack of subject matter jurisdiction,[5] additionally asking the Court

---

[3]  This Court entered an Order granting Plaintiffs' request to amend the SAC to add Plaintiffs' Supplemental Certificate as an exhibit on July 10, 2024. (Doc. 117).

[4]  Defendants do not seek dismissal of Count XIV (unjust enrichment) or Counts XV and XVI (quantum meruit). (*See* Doc. 67).

[5]  Defendants' arguments for lack of subject matter jurisdiction assume that the Court will dismiss each of Plaintiffs' counts for copyright infringement. (*Id.* at pp. 14–15). Ultimately, the Court does not dismiss each of Plaintiffs' copyright infringement counts, and it thus does not reach Defendants' arguments for lack of subject matter jurisdiction.

to strike Plaintiffs' demand for attorney's fees.[6] (Doc. 67). Plaintiffs have responded in opposition. (Doc. 91). The matter is thus ripe for review.

## II.   LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual

---

[6]   Defendants' request that the Court exercise its discretion to strike Plaintiffs' demand for attorney's fees is denied, as Plaintiffs have brought at least one claim entitling them to seek such fees. (Doc. 67, pp. 21–23); *see* 17 U.S.C. § 505 (allowing a court to award attorney's fees to the prevailing party in a copyright action).

allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

## III.    DISCUSSION

### A.    Copyright Infringement Claims (Counts III, VI, VII, VIII)

Defendants first assert that Copon has failed to state a claim under each of his copyright infringement counts, including Copon's claims for direct infringement of his copyrights in the *treatments and scripts* for the Film (Count III) and of his copyrights in *the Film* itself (Count VI) (collectively, the "**direct infringement counts**"); as well as Copon's claims for contributory infringement (Count VII) and vicarious infringement (Count VIII) of the aforementioned copyrights (collectively, the "**secondary infringement counts**").[7] (Doc. 67, pp. 2–9). Defendants raise seven arguments for dismissal relevant to the copyright infringement counts, which the Court will consider in turn. (*Id.*).

---

[7]    Collectively, the direct infringement counts and secondary infringement counts will be referred to as the "copyright infringement counts."

### 1.    *The Agreement for Directing Services*

First, Defendants broadly assert that the work-for-hire clause in the Agreement for *Directing Services* bars Copon from obtaining a copyright as to any aspect of his contributions to the Film. (*Id.* at pp. 3–4). Yet, Defendants do not cite a single legal authority in support of this conclusion. (*Id.*). Thus, the Court is not obligated to address this argument. *See W. Sur. Co. v. Steuerwald*, No. 16-61815-CV, 2017 WL 5248499, at *2 (S.D. Fla. Jan. 17, 2017)[8] ("It is axiomatic that arguments not supported and properly developed are deemed waived."); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that the court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived); *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

### 2.    *Lack of Valid Copyright Registrations*

In their second and third arguments, Defendants note that Copon does not allege that he possesses a copyright registration for *the Film*, and further posit that the "evidence of record" rebuts the notion that Plaintiffs' Shooting Script Certificate is valid. (*See* Doc. 67, pp. 4–6). Consequently, Defendants argue that Plaintiffs lack a valid copyright registration to support the copyright infringement counts, requiring dismissal of these counts. (*See id.*).

---

[8] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

To state a claim for copyright infringement under the Copyright Act, a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *See Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

Defendants' argument regarding Plaintiffs' failure to hold a valid copyright in the treatments and scripts for the Film (the "**treatments and scripts**") fails. Here, Plaintiffs have attached as exhibits to the SAC two relevant copyright registrations: Plaintiffs' Shooting Script Certificate and Plaintiffs' Supplemental Certificate. (Docs. 58-4, 103-3, 103-4 (collectively, "**Plaintiffs' Certificates**")). Plaintiffs' Certificates were registered "before or within five years after first publication" of the Film and thus "constitute prima facie evidence of the validity of the copyright[s] and of the facts stated in the certificate[s]." 17 U.S.C. § 410(c).

Importantly, Defendants wholly fail to address the validity of Plaintiffs' Supplemental Certificate.[9] Moreover, although Defendants attack the validity of Plaintiffs' Shooting Script Certificate, they primarily point to "record evidence" extrinsic to the SAC and its attachments. (Doc. 67, pp. 4–7). *But see Sprengle v. Smith Maritime Inc.*, 660 F. Supp. 3d 1337, 1350 (M.D. Fla. 2023) (noting that "as a general rule" a court may not consider documents extrinsic to the complaint at

---

[9]  The Court notes that the instant Motion was filed prior to the Court's Order granting Plaintiffs leave to supplement the SAC with Plaintiffs' Supplemental Certificate. (Doc. 117 (the "**Order**")). However, in light of the Order, the Court provided Defendants leave to file an amended motion to dismiss, but Defendants elected not to do so. (*See id.* at p. 6).

the motion to dismiss stage "without converting the motion to one for summary judgment"). Specifically, Defendants point to: (1) the Agreement for Directing Services, (2) the Oishi Deal Memo, (3) a Declaration by Oishi (the "**Oishi Declaration**"), and (4) Defendants' Shooting Script Certificate. (Doc. 67, pp. 5–6). Three of these documents—the Oishi Deal Memo, the Oishi Declaration, and Defendants' Shooting Script Certificate (collectively, the "**extrinsic documents**")—were not attached to the SAC. (*See* Docs. 58, 58-3).

Defendants' sole argument that the Court may properly consider the extrinsic documents appears in a footnote, wherein Defendants cite, but do not apply, the incorporation by reference doctrine. (*See* Doc. 67, p. 11 n.2). Of relevance:

> Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) "the plaintiff refers to certain documents in the complaint," (2) those documents are "central to the plaintiff's claim," and (3) the documents' contents are undisputed.

*Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citations omitted). Here, the Oishi Declaration is not referenced in the SAC, and indeed, it was signed after the SAC was filed. (*See* Doc. 67, p. 41). Further, Plaintiffs expressly dispute the validity of the Oishi Deal Memo and Defendants' Shooting Script Certificate. (Doc. 91, pp. 6–7). Thus, the Court does not consider the extrinsic documents here. Moreover, the Agreement for Directing Services, standing alone, does not sufficiently support Defendants' arguments to warrant dismissal of the copyright infringement counts at this stage. As a result, Defendants' third argument fails.

Defendants' second argument—regarding Plaintiffs' failure to allege that Copon holds a copyright registration in the Film—carries more weight. (*See* Doc. 67, p. 4). In their Response, Plaintiffs note that Copon's claim that he holds a copyright interest in the Film stems from his contributions as a *producer* rather than a writer. (Doc. 91, p. 16). Plaintiffs concede that they lack a copyright registration as to the Film, citing their lack of access to the Film. (*Id.* at pp. 16–17). Yet, Plaintiffs do not cite any legal authority to suggest they are somehow exempt from the registration requirement. (*Id.*).

The Copyright Act bars a plaintiff from bringing a copyright infringement action before attempting to register or preregister the relevant copyright. 17 U.S.C. § 411(a); *Kernal Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) ("[R]egistration (or refusal of registration) of a United States work 'is a prerequisite for bringing an action for copyright infringement.'" (quoting *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007))); *see also Markantone v. Podiatric Billing Specialists, LLC*, 599 F. App'x 459, 460 (3d Cir. 2015) (affirming district court's dismissal of plaintiffs' copyright infringement claim as to an unregistered copyright after declining to consider plaintiffs' argument "for what amounts to an equitable exception to the mandatory registration requirement").

However, this Court has previously held that a plaintiff's failure to register or preregister a copyright prior to filing a copyright infringement suit does not require dismissal for failure to state a claim. *GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1297 (M.D. Fla. 2015) (applying *Kernal*

*Recs.*, 694 F.3d at 1301–02). Instead, this Court held that a plaintiff can cure this deficiency so long as the plaintiff registers or preregisters the relevant copyright "by the time the Court reviews the case on summary judgment or the parties proceed to trial." *Id.* Thus, the Court will not dismiss Count VI or the relevant portions of Counts VII and VIII on this basis at this stage.

### 3.    *Copon Is Not a Joint Owner of the Film as a Derivative Work*

Next, Defendants argue that, even if Copon is deemed a co-author of the treatments and scripts, this does not necessarily make him a co-author of the Film as a derivative work. (Doc. 67, p. 6). Defendants do not cite any binding authority to support this argument, nor do they cite any cases from district courts in the Eleventh Circuit. (*See id.*). Moreover, it is unclear to the Court whether Defendants seek dismissal of the portions of Counts VII and VIII that pertain to Copon's copyrights in the *treatments and scripts* on the basis urged here. (*See id.*). In any event, Defendants do not explain why Copon's lack of co-authorship in *the Film* would require dismissal of claims pertaining to the treatments and scripts. (*See id.*). Under the circumstances, Defendants' arguments fail.

### 4.    *Plaintiffs Seek to Conduct an Improper Fishing Expedition*

Defendants next argue that Plaintiffs wrongfully seek to conduct a fishing expedition to determine the proper Defendant(s) to the suit. (*Id.* at pp. 6–7). Specifically, Plaintiffs appear to bring allegations against the various Defendants in the alternative in several Counts, noting they cannot ascertain prior to discovery

which Defendant co-owns the subject copyrights with Copon. (*See id.*).[10] Defendants cite no legal authority to support their argument that this form of pleading requires dismissal. (*See id.*). Moreover, the Federal Rules of Civil Procedure envision that Defendants may be sued "in the alternative." *See* Fed. R. Civ. P. 20(a)(2)(A); *see also Grant v. Int'l Cruise Shops, Ltd.*, No. 06-21402-CIV-GRAHAM, 2007 WL 9702365, at *1–2 (S.D. Fla. Feb. 7, 2007) (allowing a plaintiff to sue defendants in the alternative); *Tex. Emp'rs Ins. Ass'n v. Felt*, 150 F.2d 227, 231 (5th Cir. 1945)[11] (affirming a judgment in a case where plaintiffs sued defendants in the alternative). Thus, Defendants' argument does not prevail.

5.    *All Defendants Were Co-Authors or Licensees*

Defendants relatedly allege that identifying the exact co-owners of the copyrights in the relevant counts "would not cure the pleading deficiencies" because "the non-co-authors received a license to use the subject works from at least one co-author." (Doc. 67, p. 7). While this may very well prove a fruitful defense in the case as to the copyrights in the Shooting Script, the existence of any such license is not alleged in the SAC. (*See generally* Doc. 58). Moreover, this argument fails to challenge Copon's claim of infringement as to Plaintiffs'

---

[10]    Here, Defendants cite only to paragraphs in Counts I, II, and IV, although the Court notes that this language appears under additional counts. (Doc. 67, pp. 6–7 (quoting Doc. 58, ¶¶ 255, 299, 333)).

[11]    The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Supplemental Copyright, the registration for which lists Copon as the sole author and copyright claimant. (*See* Doc. 103-3). Thus, this argument fails.

6.    *1521 LLC Lawfully Created the Film as a Derivative Work*

Finally, Defendants argue that, even if Copon is a co-author of the Shooting Script, 1521 LLC was assigned Oishi's rights as a co-author in the Shooting Script. (Doc. 67, p. 9). Thus, as a joint owner of the subject copyrights, 1521 LLC had the right to create the Film as a derivative work. (*See id.*). However, the SAC takes care to allege that only the Defendants found to be non-co-owners in the copyrights in the Shooting Script are liable for infringement. (*See* Doc. 58, ¶¶ 308). Moreover, this argument once again fails to address the existence of Plaintiffs' Supplemental Certificate, which lists no co-authors or co-claimants with Copon. (*See* Doc. 103-3). Because there are no co-owners listed as to the material that is the subject of Plaintiff's Supplemental Registration, it would appear that Defendants could not have received permission to create a derivative work as to this material. (*See id.*). Consequently, at the present stage, this argument fails.

**B.    Declaratory Judgment Counts (Counts I and IV)**

In Counts I and IV, Copon seeks declaratory judgments that he is a co-author and co-owner of copyrights in the treatments and scripts and in the Film, respectively, and declaratory judgments that these are joint works. (Doc. 58, ¶¶ 253–287, 326–351). Defendants assert that the SAC fails to allege facts sufficient to support that Copon and Ho were co-authors of a joint work. (Doc. 67, pp. 9–12).

"The authors of a joint work are co[–]owners of [the] copyright in the work."

17 U.S.C. § 201(a). Further, a work is a "joint work" if it was "prepared by two or

more authors with the intention that their contributions be merged into

inseparable or interdependent parts of a unitary whole." *Id.* § 101. The Eleventh

Circuit has defined the terms "inseparable" and "interdependent" as used in this

provision, explaining:

> [I]f author B's contribution when combined with author A's
> contribution results in recasting, transforming or adapting A's
> contribution, then the two contributions may be said to be
> inseparable. If the process is simply one of assembling into a
> collective whole A's and B's respective contributions, without
> thereby recasting A's contribution, then the two contributions
> may be said to be interdependent.

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990),

*abrogated on other grounds by Fastcase, Inc. v. Lawriter, LLC*, 907 F.3d 1335

(11th Cir. 2018) (internal quotation omitted).

Here, Plaintiffs have sufficiently pled Copon's co-authorship in the Shooting

Script as a joint work. The SAC alleges that Ho facilitated a back-and-forth between

himself, Copon, and Oishi, whereby Copon's notes and revisions were incorporated

into Oishi's treatments and script for the Film. (*See* Doc. 58, ¶¶ 86, 92–101).

Ultimately, the allegations support that these efforts transformed or adapted

Oishi's contributions, resulting in the Shooting Script as an inseparable whole,

which appears to have been the clear intent of all involved. (*See id.*).

Defendants also argue that Copon's contributions to the Shooting Script

must be independently copyrightable for Copon to be considered a co-author or

co-owner of the copyrights therein. (Doc. 67, p. 11). However, even assuming this is required, Plaintiffs appear to clear this bar, as Copon has successfully registered a copyright in his contributions to the Shooting Script. (*See* Doc. 103-3). Thus, Defendants' argument for dismissal of Count I lacks merit.

The Court finds that Plaintiffs have also very narrowly pled Copon's co-authorship in the Film based upon his producing services. The SAC repeatedly alleges that Ho and Copon expressly agreed that they would be co-producing the Film, suggesting that they intended to be co-authors, at least to the extent such co-authorship in the cited producing activities is possible under copyright law. (*See, e.g.*, Doc. 58, ¶ 76 ("It was agreed and understood by Ho and Copon that Copon would undertake producing activities for The Film and Ho and Copon would be partners in The Film.")). Moreover, the SAC alleges that Copon was engaging in such activities up through to the time of principal photography, which supports Plaintiffs' claim that they merged with the contributions of Ho, or potentially others, into the Film. (*Id.* ¶ 81).

Here again, assuming Plaintiffs' producing activities must be independently copyrightable for Copon and Ho to be deemed co-authors in the Film, Plaintiffs have included allegations that very narrowly clear this bar. As an important threshold matter, "[i]t is well settled that ideas alone are not copyrightable." *MacNeill v. Yates*, No. 6:09-cv-706-ORL-31DAB, 2010 WL 2330275, at *4 (M.D. Fla. June 10, 2010); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection . . . extend to any idea, procedure, process, system, method of operation,

concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *M.G.B. Homes*, 903 F.2d at 1493 (holding that a home builder was not a co-author of a floor plan, in part because "[h]is ideas, conveyed to the author of the copyrighted work . . . were not copyrightable"). Further, to be copyrightable, material must be "fixed in a[] tangible medium of expression." 17 U.S.C. § 102(a). This is because, under copyright law, a work is not "created" until "it is fixed in copy . . . for the first time." *M.G.B. Homes*, 903 F.2d at 1493 n.16 (quoting 17 U.S.C. § 101).

The SAC broadly avers that Copon contributed the following producing services to the Film:

> Beginning in mid January 2022, and continuing throughout until around mid-September, Copon [engaged in] . . . development, outreach to potential distributors . . . , storyboards, lighting designs, location designs, cast list, negotiations with name talent, hiring of crew, designation of necessary camera and lighting equipment necessary, budgeting, scheduling, production design, costume design, set design, etc.

(Doc. 58, ¶ 81). Most of these producing activities are clearly not susceptible to being "fixed in a[] tangible medium of expression." 17 U.S.C. § 102(a). For example, one cannot so fix "outreach to potential distributors," "cast list," "negotiations with name talent," or "hiring of crew." (*See* Doc. 58, ¶ 81).

However, taking the allegations in the light most favorable to the Plaintiffs, as the Court must do, certain of Copon's alleged producing activities are conceivably susceptible to being fixed in a tangible medium of expression, such as costume design and set design. (*See id.*); *Hunnings*, 29 F.3d at 1484. Further, to

the extent that Plaintiffs have included a count for infringement of the purported copyrights in these producing services, they have alleged the services are independently copyrightable. (Doc. 67, p. 11; Doc. 58, ¶¶ 363–396). As such, Count IV survives Defendants' arguments, at least at the motion to dismiss stage.

**C.    Breach of Oral Contract (Counts XII and XIII), Fraudulent Misrepresentation (Counts XVII and XVIII), Violation of Right of Publicity (Count XIX), and Misappropriation of Likeness (Count XX)**

In Count XII, Copon Studios brings a claim for breach of oral contract premised upon Defendants' failure to pay Copon Studios for the use of the Equipment during principal photography. (Doc. 58, ¶¶ 482–97). Similarly, in Count XIII, Copon brings a claim for breach of oral contract premised upon Defendants' failure to pay Copon for acting in the Film. (*Id.* ¶¶ 499–513). Defendants argue both claims should be dismissed because the alleged oral contracts were entered into after the Agreement for Directing Services was signed, which contains a merger clause (the "**merger clause**"). (Doc. 67, pp. 15–16).

Here, again, Defendants do not cite a single legal authority to support their arguments that the Agreement for Directing Services should entirely bar Plaintiffs' claims, and this point is not obvious.[12] Thus, Defendants' arguments for dismissal

---

[12]    For example, Count XII is brought on behalf of Copon Studios and Copon Studios was not a party to the Agreement for Directing Services. (Doc. 58, ¶¶ 482–97). Further, Ho appears to have signed the Agreement for Directing Services only in his capacity as CEO of 1521 LLC, not individually or on behalf of the remaining Defendant Business Entities. (Doc. 58-3). Moreover, Defendants do not provide what state's contract law should apply to the issue.

of Counts XII and XIII are deemed waived. *See, e.g.*, *W. Sur. Co.*, 2017 WL 5248499, at *2; *U.S. Steel Corp*, 495 F.3d at 1287 n.13.

Additionally, it is generally considered improper for a court to interpret a contract at the motion to dismiss stage where the parties dispute the meaning of the relevant terms. *E.g.*, *BioHealth Med. Lab., Inc. v. Cigna Health & Life Ins. Co.*, 706 F. App'x 521, 524 (11th Cir. 2017); *Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*, 724 F. Supp. 2d 1228, 1239 (S.D. Fla. 2010) ("The parties' differing interpretations of their respective obligations under the pledge agreement demonstrate that this issue is not ripe for decision at the motion to dismiss stage"). While both Plaintiffs and Defendants argue that the merger clause is unambiguous, they offer diametrically opposed interpretations of its meaning. (*See* Doc. 67, pp. 15–18; Doc. 91, p. 14). Therefore, Defendants' arguments that rest upon the Court's interpretation of the merger clause—including their arguments for dismissal of Plaintiffs' claims for fraudulent misrepresentation (Counts XVII and XVIII) are unavailing. (*See* Doc. 67, pp. 15–18). Similarly, because Defendants' arguments for dismissal of Count XIX (violation of right of publicity) and Count XX (misappropriation of likeness) rest upon disputed language within the same contract, these arguments also fail. (*See id.* at pp. 18–19).

### D.    Lanham Act Claims (Counts X and XI)

In Counts X and XI, Copon and Copon Studios, respectively, bring Lanham Act claims against Defendants for false association, unfair competition, false

designation of origin, and false advertising.[13] (Doc. 58, ¶¶ 449–82). Each of these

claims is based upon Defendants' alleged use of the False Credits in the Film and

in advertisements. (*See id.*). Plaintiffs' claims are brought under 15 U.S.C. § 1125(a)

of the Lanham Act, commonly referred to as Section 43(a), which states as follows:

> (1) Any person who, on or in connection with any goods or
> service . . . uses in commerce any word, term, name, symbol,
> or device, or any combination thereof, or any false designation
> of origin, false or misleading description of fact, or false or
> misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or
>> to deceive as to the affiliation, connection, or
>> association of such person with another person, or as
>> to the origin, sponsorship, or approval of his or her
>> goods, services, or commercial activities by another
>> person, or
>>
>> (B) in commercial advertising or promotion,
>> misrepresents the nature, characteristics, qualities, or
>> geographic origin of his or her or another person's
>> goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that
> he or she is or is likely to be damaged by such act.

§ 1125(a)(1)(A)–(B).

### 1.    *False Designation of Origin and False Advertising Claims*

In Count X, Copon alleges, in part, that Defendants use of the False Credits

constitutes false designation of origin of writing, directing, and producing services.

(*See* Doc. 58, ¶ 451). Likewise, in Count XI, Copon Studios alleges, in part, that

---

[13] While Defendants argue that Plaintiffs' various Lanham Act claims should have been brought
under separate Counts, the only case cited by Defendants in support of this argument—*P & J
Consulting, Inc. v. Bauer*, No. 6:08-cv-906-Orl-22KRS, 2008 U.S. Dist. LEXIS 128153, at *1–
11 (M.D. Fla. Dec. 1, 2008)—does not directly address this issue. Accordingly, the Court
declines to dismiss Counts X and XI on this basis.

Defendants use of the False Credits constitutes false designation of origin of
production company services. (*Id.* ¶ 469). In their Response, Plaintiffs confirm that
their claims stem from the contribution of their services to the Film and underlying
video footage as they are embodied in those "goods." (Doc. 91, p. 21). Thus, in
Counts X and XI, Plaintiffs bring claims of "reverse passing off," which "occurs
when a party misrepresents someone else's goods or services as its own."
*Appjigger GMBH v. BLU Prods., Inc.*, No. 15–22313–CIV, 2016 WL 4119720, at
*3 (S.D. Fla. Mar. 4, 2016) (citation omitted).

Defendants argue these claims are forbidden under *Dastar Corp. v.
Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and its progeny. (Doc. 67,
pp. 19–21). The pertinent facts of *Dastar* are as follows. After World War II,
President Dwight D. Eisenhower wrote a book chronicling the allied campaign in
Europe. *Dastar*, 539 U.S. at 26. The respondent, Twentieth Century Fox
Corporation ("**Fox**"), held the exclusive rights to make the book into a television
series (the "**TV series**"), which it did. *Id.* Though the TV series was initially
copyrighted, the copyright expired, and for many years, the TV series was in the
public domain. *Id.* However, Fox later reacquired the rights in the TV series and
granted its co-respondents, SFM Entertainment and New Line Home Video, Inc.,[14]
the exclusive rights to restore, repackage, and redistribute the TV series on
videotapes. *Id.* Meanwhile, petitioner Dastar obtained tapes of the original TV

---

[14] Collectively, Fox, SFM Entertainment, and New Line Home Video, Inc., will be referred to as
the "respondents."

series and made slight modifications thereto before packaging and releasing them as its own product (the "**Dastar video set**"). *Id.* at 27.

The respondents sued Dastar under the Lanham Act and claimed it was selling the Dastar video set "without proper credit" to the TV series and was thus a reverse passing off under Section 43(a). *Id.* at 27–28. The district court granted summary judgment for the respondents and the Ninth Circuit affirmed. *Id.* at 31.

Ultimately, however, the United States Supreme Court reversed, finding the respondents could not prevail on their false designation of origin claims. *Id.* at 38. The Court explained that the claims "would undoubtedly be sustained if Dastar had bought some of [respondents'] videotapes and merely repackaged them as its own," since it would be clear that the respondents were the *origin* of the tapes. *Id.* However, because Dastar had made minor modifications to the TV series before repackaging the footage, the Court needed to determine the proper "origin" of the tapes as that word is used within the Lanham Act. *Id.* The Court explained:

> The most natural understanding of the "origin" of "goods"—the source of wares—is the producer of the tangible product sold in the marketplace, in this case the physical . . . videotape sold by Dastar. . . . **But as used in the Lanham Act, the phrase "origin of goods" is in our view incapable of connoting the person or entity that originated the ideas or communications that "goods" embody or contain.** Such an extension would not only stretch the text, but it would be out of accord with the history and purpose of the Lanham Act and inconsistent with precedent.

*Id.* at 31–32 (emphasis added). The Court further declined to afford "special treatment to communicative products" such as videotapes under the Lanham Act,

because this would "cause[] the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." *Id.* at 33.

*Dastar* has been broadly applied to prevent plaintiffs from bringing false designation of origin claims based upon contributions of authorship, concepts, or ideas to the underlying "goods."[15] Indeed, in a case strikingly similar to the case at bar, a California district court applied *Dastar* to dismiss claims brought by a film director, writer, and editor. *See Williams v. U.M.G. Recordings, Inc.*, 281 F. Supp. 2d 1177, 1178, 1183–85 (C.D. Cal. 2003). The court found that the plaintiff's claims—which were rooted in the allegation that the defendants had listed false credits on a film for which plaintiff had written a script, provided editing services, and re-scored the music—were barred as a matter of law. *Id.* at 1183–85.

Further, *Dastar* has been found to bar false advertising claims brought under the Lanham Act on the same basis. *E.g.*, *Appjigger*, 2016 WL 4119720 at *4 ("[A]uthorship, like licensing status, is not a nature, characteristic, or quality, as

---

[15] *See, e.g.*, *Arthur Rutenberg Homes, Inc. v. Hillcrest Homes & Dev., Inc.*, No. 6:05-cv-1350-Orl-22DAB, 2006 WL 8439355, at *1–3 (M.D. Fla. Feb. 2, 2006), *report & recommendation adopted*, 2006 WL 8439356 (M.D. Fla. Feb. 26, 2006) (recommending dismissal of Lanham Act counterclaim after noting that "[a]t best, the [defendants] assert that they are the originator of the ideas" contained within the floor plan at issue); *Appjigger*, 2016 WL 4119720, at *3 (finding plaintiffs failed to state Lanham Act claims as to defendants' mobile devices since plaintiffs "have alleged that they created some of the software, ideas, or concepts embodied in [d]efendants' devices," but not that plaintiffs created the mobile devices themselves); *Hustlers, Inc. v. Thomasson*, No. 1:01-cv-3026-TWT, 2004 WL 3241667, at *3 (N.D. Ga. Dec. 29, 2004) (granting summary judgment to defendants on plaintiff music publisher's claim, which was based on the allegation that defendants caused another entity to be credited with holding the copyright to certain songs actually held by plaintiff, since plaintiff "is not the 'origin' of any good or service in this case"); *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, No. 11 C 5177, 2012 WL 414803, at *3–4 (N.D. Ill. Feb. 8, 2012) (applying *Dastar* to dismiss a plaintiff's Lanham Act claims premised upon allegations that the defendants had "incorporated [the plaintiff's] copyrighted poems into their own products" since "[d]efendants have not sold [the plaintiff's] tangible products as their own").

those terms are used in Section 43(a)(1)(B) of the Lanham Act." (quoting *Baden Sports, Inc. v. Molten USA Inc.*, 556 F.3d 1300, 1307 (Fed. Cir. 2009))); *Scanz Techs., Inc. v. JewMon Enters., LLC*, No. 20-22957-Civ-Scola, 2021 U.S. Dist. LEXIS 2651, at *37–38 (S.D. Fla. Jan. 6, 2021) ("A plaintiff 'cannot plead around *Dastar* by shoe-horn[ing]' a claim for improper authorship credit into a false advertising theory.'" (quoting *Wilchcombe v. Teevee Toons, Inc.*, 515 F. Supp. 2d 1297, 1305 (N.D. Ga. 2007))).

Here, Copon's claims for false designation of origin as to his writing, directing, and producing services, fall squarely within the purview of *Dastar*. Through the aforementioned services, Copon contributed "ideas or communications" that the Film "embodie[s] or contain[s]." *Dastar*, 539 U.S. at 31–32. Further, because Copon's claims concern a communicative product (a Film), allowing these claims would "cause[] the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." [16] *Id.* at 33. Thus, Copon fails to state a claim for false designation of origin under Count X. Further, Copon cannot "plead around *Dastar* by shoe-horn[ing]" the forbidden claims "into a false

---

[16] Although Plaintiffs attempt to couch their contributions to the Film in the language of "services," Plaintiffs ultimately concede that the relevant misrepresentations are embodied within the video footage and Film as "goods." (Doc. 91, p. 21); *see also Williams*, 281 F. Supp. at 1184 ("*Dastar* makes clear that a claim that a defendant's failure to credit the plaintiff on the defendant's goods is actionable only where the defendant literally repackages the plaintiff's goods and sells them as the defendant's own—not where, as here, Defendants are accused only of failing to identify someone who contributed not goods, but ideas or communications (or, for that matter, 'services') to Defendants' product."). Further, although Plaintiff cites to *Gensler v. Strabala*, 764 F.3d 735 (7th Cir. 2014) in support of this point, this case is distinguishable, since the *Gensler* court found that the claims at issue fell outside of the scope of copyright law. *Id.* at 737; (Doc. 91, p. 24). Here, as described above, Plaintiffs' claims fall within the scope of copyright law.

advertising theory." *Scanz Techs.*, 2021 U.S. Dist. LEXIS 2651, at *37–38 (quoting *Wilchcombe*, 515 F. Supp. 2d at 1305). Thus, because Copon's false advertising claims are rooted in precisely the same allegations as his false designation of origin claims, the false advertising claims also fail.

Copon Studios also fails to state claims for false designation of origin and false advertising in Count XI. These claims are rooted in Defendants' alleged use of the False Credits as to producing services. (Doc. 58, ¶ 469). Of note, the SAC alleges that the footage from principal photography was shot on Copon Studios' Drives. (*E.g.*, *id.* ¶ 144). Had Defendants left this raw footage untouched "before repackaging the footage as its own," Copon Studios' claims would fall outside of *Dastar*'s reach. *See* 539 U.S. at 38. Instead, Plaintiffs allege that Defendants locked Plaintiffs out of the post-production process entirely, demanding that Plaintiffs send the Drives containing the video footage to Defendants, who then edited the footage using their own editor and post-production team. (Doc. 58, ¶¶ 207–10). Thus, Copon Studios' claims for false designation of origin and false advertising fall within the ambit of *Dastar* and are due to be dismissed. *See Dastar*, 539 U.S. at 31 (holding that even "minor" changes made by Dastar to the relevant footage precluded the respondents' Lanham Act claims).

### 2.    *Claims for False Association and Unfair Competition*

In Counts X and XI, Plaintiffs also attempt to bring Lanham Act claims for false association and unfair competition. (Doc. 58, ¶¶ 451, 462). Defendants argue the false association claims should be dismissed as they require Plaintiffs to show

Defendants "adopted a mark confusingly similar to plaintiff's mark." (Doc. 67, pp. 20–21 (quotation omitted)). This standard actually applies to Plaintiffs' claims for unfair competition. *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1266 (11th Cir. 2016) (differentiating between these claims). However, the Court agrees that Plaintiffs wholly fail to allege facts supporting the existence of such a confusing similarity. (*See generally* Doc. 58). Accordingly, Plaintiffs' claims for unfair competition in Counts X and XII are due to be dismissed.

Finally, Plaintiffs fail to state claims for false association.[17] The Eleventh Circuit has noted that a false association claim can be brought in a broader set of circumstances than can an unfair competition claim. *Fla. Int'l Univ.*, 830 F.3d at 1266 (holding the language in Section 43(a)(1) can encompass a claim where the parties are not likely to be confused for one or another due to the similarity of the marks, but where those marks "create the false impression" that the parties are associated with one another). Here, Plaintiffs have pled no facts to support such a false association. (*See* Doc. 58). Indeed, the crux of Plaintiffs' allegations concern Defendants' *failure* to create an association between Plaintiffs and Defendants by failing to credit Plaintiffs for their services as to the Film. Further, Plaintiffs' fail to argue or otherwise present legal authority supporting that a false association claim

---

[17] It is unclear whether Plaintiffs' references to "false association" are meant to simply reiterate their claims for false designation of origin under § 1125(a)(1)(A), as this prong of the Lanham Act is generically referred to as creating liability for false association. *E.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ("Section 1125(a) . . . creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."). In any event, the Court finds Plaintiffs have failed to state separate claims for false association assuming they sought to do so.

can be brought under such facts. (*See* Doc. 91, pp. 21–24). Thus, Plaintiffs' claims for false association are due to be dismissed with prejudice.[18]

## IV.    CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1.    Defendants' Motion to Dismiss Second Amended Complaint and to Strike Plaintiffs' Demand for Attorney's Fees (Doc. 67) is **GRANTED IN PART** and **DENIED IN PART**.

2.    Counts X and XI of the Second Amended Complaint (Doc. 58) are **DISMISSED WITH PREJUDICE**.

3.    Defendants' Motion to Dismiss Second Amended Complaint and to Strike Plaintiffs' Demand for Attorney's Fees (Doc. 67) is **DENIED** in all other respects.

**DONE AND ORDERED** in Orlando, Florida on January 10, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[18]    In light of the fast-approaching deadline for filing dispositive motions, the Court will entertain any motions for extending this deadline that the parties believe may be warranted.